James GRECO, Plaintiff,

v.

COUNTY OF NASSAU, Joseph T. Jablonski, Sheriff of the County of Nassau, in his Individual and Professional Capacity, Paul Schoenberger, Deputy Undersheriff of the County of Nassau, in his Individual and Professional Capacity, Defendants.

No. CV 99–3032.

United States District Court, E.D. New York.

May 29, 2001.

236

Raymond Nardo, Mineola, NY, for Plaintiff.

Snitow & Cunningham, LLP by Paul F. Millus, Lisa E. Mudd, New York City, for Defendants.

### MEMORANDUM AND ORDER

WEXLER, District Judge.

This is an employment discrimination case alleging violations of: (1) the Americans With Disabilities Act, 42 U.S.C. § 12102 (the "ADA"); (2) the Rehabilitation Act, 29 U.S.C. § 794(a); (3) 42 U.S.C. § 1983 ("Section 1983"); and (4) the New York State Human Rights Law. Additionally, Plaintiff asserts a state law defamation claim.

Plaintiff, James Greco, ("Plaintiff" or "Greco") a Corrections Officer with the Nassau County Sheriff's Department. He contends that he was discriminated against in the terms and conditions of his employment on account of an alleged perceived disability in violation of the ADA and Rehabilitation Act. Greco also claims retaliation for exercising his rights pursuant to these statutes. The facts alleged in support of these federal claims are also urged in support of Plaintiff's state law employment discrimination claim. Plaintiff's Sec-

tion 1983 claims are premised upon alleged violations of his First and Fourteenth Amendment rights. Finally, Plaintiff's slander claim is premised upon an incident during which he was accused of violating the law by being outside and working when he was on disability leave.

Named as defendants are the County of Nassau (Plaintiff's employer), Joseph T. Jablonsky, the Nassau County Sheriff at all relevant times ("Jablonsky" or the "Sheriff"), and Paul Schoenberger, a Deputy Undersheriff for Nassau County ("Schoenberger") (collectively "Defendants").

Presently before the court is the motion of Defendants for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, the court dismisses all of Plaintiff's federal claims and declines to exercise jurisdiction over the pendent state law claims.

## BACKGROUND

### I. Factual Background

The complaint, deposition testimony and other documents submitted in support of and in opposition to the motion reveal the facts set forth below. Except where noted, the facts are undisputed. Where facts are in dispute, they are related in the light most favorable to Plaintiff, the non-moving party.

### A. Plaintiff's Employment With the Sheriff's Department

#### 1. Plaintiff's Assigned Posts

Plaintiff has been employed as a Corrections Officer with the Nassau County Sheriff's Department since February of 1990. Plaintiff also runs a private business known as the Long Island Canine Service. In this business, Plaintiff sells puppies and is involved in obedience training of dogs.

For the first two years of his employment as a Corrections Officer, Plaintiff worked as a "floater," *i.e.*, he was not assigned to a particular post. Thereafter, Plaintiff was assigned to work in the "J" and "K" dormitories until he secured a position at the "3500" control desk. After this position, Plaintiff was assigned to work at the "4500" control desk.

From May of 1995 until June of 1996, Plaintiff took an extended leave of absence, pursuant to General Municipal Law § 207–c, due to a work-related injury. Upon his return to work, Plaintiff was not assigned to the same position he left (the 4500 control desk), but was assigned to the "832 delivery gate." This position is considered to be a "light duty" post because it does not involve inmate contact. Light duty posts are available to Corrections Officers who are unable to perform full duty or for the protection of officers who might re-injure themselves if exposed to physical confrontation with an inmate.

Although the precise date is unclear, it appears that while Plaintiff was assigned to the 832 delivery gate, he was also designated as an "alternate" at the 3500 control desk. As an alternate, Greco would be assigned to the 3500 control desk only if another officer was unable to man the post.

On January 9, 2000, Plaintiff was removed from his position at the 832 delivery gate and from his designation as a 3500 control desk alternate. At that time, he was designated a floater, where his position could change depending upon the needs of the facility. Plaintiff alleges that he was deprived of significant overtime opportunities by being placed at the 832 delivery gate and/or the floater position.

#### 2. Requests for Assignment to the K–9 Unit

Beginning in May of 1992, Plaintiff submitted his first application for a position

with the Sheriff's K–9 Unit, training dogs. Plaintiff applied for the position in 1992, 1993, 1994 and 1995. Each year, he was rejected. Plaintiff's final application for assignment to the K–9 Unit was made in March of 2000. This application was made in the form of a letter request outlining Plaintiff's qualifications. No formal job application was completed.

Defendant Schoenberger was aware of Plaintiff's letter requesting appointment to the K–9 Unit and wrote to the Sheriff in connection with the request. Specifically, in a letter to Jablonsky, Schoenberger noted that Greco was currently suing the County for employment discrimination. Schoenberger attached a sample rejection letter to this correspondence for the Sheriff's signature and offered to send the letter directly to Greco. The letter suggested by Schoenberger informed Greco that there were no current openings in the K–9 Unit and asked that proper application procedures be followed in the future. Ultimately, Greco was again rejected for assignment to the K–9 Unit.

### 3. *Plaintiff's Assignment, Removal and Re–Assignment to the "SERT" Team*

In 1994, upon the recommendation of Schoenberger, Plaintiff was assigned to the Sheriff's Emergency Response Team (the "SERT" team). The SERT team is an on-call unit that handles emergency matters involving the extraction of recalcitrant or violent inmates from their cells. Members of this team carry beepers to be able to respond immediately to emergency situations. They must be physically fit to handle their duties and physically available to respond. SERT team members are not entitled to any additional pay or benefits other than possible overtime if called into service. Assignment to the SERT team is not considered to be a promotion and membership on the team is a privilege and not a right.

In June of 1997, Plaintiff was removed from his assignment to the SERT team. In 1998, he was returned to the SERT team. At the same time, Plaintiff's request for assignment to a section of the jail where he could work with minors was granted. Plaintiff remains a member of the SERT team.

### B. *Plaintiff's Attendance Record*

Plaintiff's full attendance record and his personal diary are contained in the County's Rule 56.1 statement and are properly before the court. The County relies upon these documents to portray Plaintiff as an "abject abuser" of the generous number of sick days, personal leave and vacation time benefits provided to Corrections Officers. The record reveals that Plaintiff has taken every sick, personal and vacation day granted to Corrections Officers and that he presently has no such days accrued or unused.

The County points to entries in Plaintiff's diary as evidence that the leave time used by Plaintiff was not for legitimate purposes. To illustrate, Greco's personal diary contains entries such as "fishing tournament" or "dog show," and refers to hunting sitings on days also noting "sick day" or "OJI" (on the job injury) days. Greco does not dispute the County's record-keeping.[1] Instead, he alleges an entitlement to all days utilized, argues that he was truly sick and sees nothing wrong with using all benefits available. Greco ex-

---

1. Greco states that he has not been provided with adequate records to dispute the County's records for the year 1999. He does not dispute, however, the days reflected in the rec- ords for the other years of his employment and makes no real argument that he has used less than the time granted to all Corrections Officers.

plains the diary entries as scheduled activities that he did not attend due to illness. He explains the hunting sitings as information related to him by friends who were not too sick to go hunting.

In 1997, Plaintiff received a "Notice of Personnel Action," noting Plaintiff's absences from work and referring to Plaintiff's attendance as revealing a "chronic and patterned abuse of leave." Plaintiff's performance evaluation indicated that his "time utilization" was "unsatisfactory." Although Plaintiff's attendance record improved somewhat in 1998, the County alleges that in 1999, Plaintiff returned to his pattern of abusing sick and leave time.

On August 18, 2000, Plaintiff alleges that he sustained an on the job injury when he intervened in a violent inmate confrontation. Plaintiff states that as a result of this altercation he suffered injuries to his knees, legs and head. Greco claims that he was absent from work on thirty days as a result of this injury. The County disputes the extent of Plaintiff's injuries and the legitimacy of the sick leave that followed the August 18th incident.

### C. The Incident Involving the German Shepard Photograph

In February of 1999, Plaintiff noticed a photocopy of a photograph of a German Shepard taped to the inside window of the 3500 control desk. The dog in the photograph was wearing a collar upon which the name "Greco" was written. Plaintiff complained to the bias unit of the Sheriff's department about the photograph. Affirmative Action Interim Officer Stephen Brown removed the photograph and investigated the incident. The person who posted the photograph was never identified but a notice of personnel action was issued to the Lieutenant in charge of supervising the 3500 control desk, reprimanding him for failing to take immediate

action. The County asserts, and Plaintiff agrees, that the photograph was posted in blatant violation of County policy. Although Greco was disappointed with the level of punishment meted out in connection with this incident, he was otherwise pleased with the way in which his complaint was handled.

### D. Greco's Subpoena To Testify Before The Nassau County Legislature

In January 2000, Greco was subpoenaed to testify before the Nassau County Legislature. The subpoena requested that Greco give testimony pertaining to a report dated December 15, 1998, concerning overtime at the Nassau County Correctional Center. Greco states that after he appeared to give testimony, he was asked by a Sheriff's Department employee why he was subpoenaed. He also asserts that Sergeant Rogers of the Sheriff's Department approached him at work and inquired as to why Greco was subpoenaed.

### E. The Observation of Plaintiff While on Leave

On September 23, 2000, after the filing of this lawsuit, Plaintiff was once again on disability leave. While he was out of work, Plaintiff was observed by Sheriff's Department employee Michael Golio, who noticed Plaintiff in a park training a dog, accompanied by the dog's owner. Golio was off duty when he observed Greco and was not acting on official Sheriff Department business. Instead, Golio saw Greco by chance. Upon observing Greco, Golio called John Covais, a Lieutenant with the Central Investigation Unit at the Sheriff's Department to determine whether Greco was on disability leave at the time. It was Golio's understanding that Greco was violating the terms of his disability leave by engaging in dog training while on leave.

After speaking to Golio on the telephone, Covais went to the park to observe Greco. According to Plaintiff, Covais approached Plaintiff and the dog owner and informed the owner that Plaintiff was violating County and State policy and regulations by being outside when he was supposed to have been confined to his home because of his medical condition.

Plaintiff states that he was violating no policy or regulation by being outdoors and that he was followed by Golio in retaliation for the filing of this lawsuit. He further argues that Covais defamed him when speaking to the dog owner.

## II. Plaintiff's Claims of Discrimination

Plaintiff's first claim of employment discrimination was made in the form of a complaint to the Equal Employment Opportunity Commission ("EEOC") in September of 1997. This complaint alleged that Plaintiff was being discriminated against on the basis of a perceived disability. In March of 1999, Plaintiff filed a bias complaint with the County arising out of the dog collar incident described above. This lawsuit was filed in May of 1999.

In his lawsuit, Plaintiff claims discrimination in contravention of the ADA and the Rehabilitation Act on the ground raised in the EEOC complaint, i.e., that Defendants unlawfully perceived him as disabled. Specifically, he claims that he was wrongfully assigned to a light duty post and deprived of attendant overtime opportunities when returning from his disability leave in 1996. He also asserts that he was not appointed to the K–9 Unit because he was perceived as disabled. Plaintiff's Section 1983 claims allege a violation of his Constitutional rights pursuant to the First and Fourteenth Amendments. The First Amendment claim arises out of Plaintiff's testimony before the Nassau County Legislature. The Fourteenth Amendment claim is an Equal Protection claim based upon the dog collar incident.

Plaintiff also alleges that Defendants retaliated against him for assertion of his ADA, Rehabilitation Act and Constitutional rights. The precise acts of retaliation alleged are set forth by Plaintiff in his Rule 56.1 Statement filed in connection with the present summary judgment motion.

Specifically, Plaintiff's retaliation claims allege that Greco was deprived of overtime and favorable treatment in March of 1999 and made to work overtime when he did not so desire in April of 1999 in retaliation for the 1997 charge with the EEOC and the 1999 complaint to the bias unit. Plaintiff claims that a September 1999 negative performance evaluation was rendered in retaliation for the filing of this lawsuit. He also claims that a December 1999 disciplinary memo and his January 2000 assignment as a floater were decisions made in retaliation for the filing of this lawsuit. Finally, Greco claims that his latest rejection for appointment to the K–9 Unit and the September 2000 incident in the park were measures taken in retaliation for his giving testimony before the Nassau County Legislature as well as for the filing of this lawsuit.

In addition to seeking to hold the County responsible for the discrimination alleged in the complaint, Plaintiff seeks to hold defendants Schoenberger and Jablonsky personally liable. Plaintiff alleges personal involvement by defendant Schoenberger based upon the fact that Schoenberger was responsible for deciding who would be named to the SERT team and who would be appointed to the K–9 Unit—two positions affecting Plaintiff's career. As to former Nassau County Sheriff Jablonsky, Plaintiff seeks to hold this defendant personally liable on the ground that

he is the "ultimate decisionmaker" for all department appointments.

### III. *The Motion for Summary Judgment*

Defendants seek summary judgment in connection with Plaintiff's claims pursuant to the ADA and the Rehabilitation Act on the ground that Plaintiff fails to set forth a prima facie case of discrimination. Specifically, Defendants argue that Plaintiff cannot show that he was perceived as disabled within the meaning of the relevant statutes. Defendants further argue that even if Plaintiff can show a disability, summary judgment is nonetheless appropriate because Plaintiff cannot show that he suffered any adverse changes in the conditions of his employment sufficient to state a claim.

Summary judgment on the retaliation claims is sought on the grounds set forth above (Plaintiff was not perceived to be disabled and suffered no adverse employment action) as well as on the grounds that: (1) Plaintiff cannot show a causal connection between the alleged acts of retaliation and changes in Plaintiff's employment and (2) Defendants' actions were based upon Plaintiff's poor attendance record which establishes a legitimate non-discriminatory reason for Plaintiff's assignment to various posts within the Sheriff's Department. Summary judgment on behalf of the individual defendants is sought on the ground that personal liability is not available under the ADA or the Rehabilitation Act.

Defendants seek judgment on Plaintiff's First Amendment Section 1983 claim on the grounds that Plaintiff can establish neither the exercise of constitutionally protected activity nor any connection between any claimed activity and an adverse employment decision. Summary judgment on the Fourteenth Amendment claim is sought on the ground that Plaintiff can prove neither class-based nor arbitrary and irrational discrimination. The County also argues that Plaintiff is unable to point to an unconstitutional policy sufficient to impose liability under the standards set forth in *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Jablonsky and Schoenberger seek dismissal of the claims pursuant to Section 1983 on the ground that Plaintiff cannot show the personal involvement necessary to impose individual liability.

After outlining the applicable legal principles the court will consider the merits of the motion.

### DISCUSSION

### I. *Legal Principles*

#### A. *Standards For Summary Judgement*

A motion for summary judgement is properly granted only if the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FRCP 56(c); *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking judgment bears the burden of demonstrating that no issue of fact exists. *McLee v. Chrysler Corp.* 109 F.3d 130, 134 (2d Cir.1997). However, when the nonmoving party fails to make a showing on an essential elements of its case with respect to which it bears the burden of proof, summary judgment will be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party resisting summary judgment must not only show a disputed issue of fact, but it must also be a material fact in light of substantive law. Only disputed facts that "might affect the outcome of the suit under the governing law will properly preclude the

242

entry of summary judgment." *Anderson,* 477 U.S. at 242, 106 S.Ct. 2505.

### B. *Burden Shifting Analysis*

■ Claims of employment discrimination, whether brought pursuant to the ADA or the Rehabilitation Act, are subject to the burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see Heyman v. Queens Village Committee for Mental Health,* 198 F.3d 68, 72 (2d Cir.1999) (case brought pursuant to the ADA).

■ Under the *McDonnell Douglas* analysis, the plaintiff bears the burden of coming forward with a *prima facie* case of discrimination. The burden of production then shifts to defendant to offer a non-discriminatory reason for the employment action. Thereafter, it is for the plaintiff to show that the reason offered by defendant is a pretext for discrimination. The plaintiff's final burden is satisfied either by the introduction of additional evidence or by reliance on the evidence submitted in support of the *prima facie* case of discrimination. *Heyman,* 198 F.3d at 72; *see Reeves v. Sanderson Plumbing,* 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000).

### C. *Elements of an ADA Claim*

■ To state a *prima facie* case of discrimination pursuant to the ADA a plaintiff must show: (1) that his employer is subject to the ADA; (2) that he is an individual with a disability within the meaning of the statute; (3) that he was otherwise qualified to perform the essential functions of his position, with or without reasonable accommodation; and (4) that he was fired or suffered adverse employment action because of the disability. *Heyman,* 198 F.3d at 72; *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998); *Sacay v. Research Foundation*

of the City University of New York, 44 F.Supp.2d 496, 500 (E.D.N.Y.1999).

#### 1. *Disability Within the Meaning of the ADA*

The ADA defines disability, *inter alia,* as a physical or mental impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(2); *Schaefer v. State Ins. Fund,* 207 F.3d 139, 141 (2d Cir.2000); *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869 (2d Cir.1998); *Zuppardo v. Suffolk County Vanderbuilt Museum,* 19 F.Supp.2d 52, 54 (E.D.N.Y.1998), *aff'd,* 173 F.3d 848 (2d Cir.1999). Also defined as disabilities under the ADA are: (1) a record of having a disability or (2) being perceived as having a disability. 42 U.S.C. § 12101(2).

■ While all impairments may be argued to affect a major life activity, every impaired person is not disabled within the meaning of the ADA. To determine disability it is appropriate to distinguish between impairments that merely "affect" a major life activity—which are not ADA disabilities—and those that substantially limit major life activities—which are ADA disabilities. *Ryan,* 135 F.3d at 870.

Physical impairments that might amount to a disability include anatomical losses affecting one or more of the body's systems, including, *inter alia,* the neurological and musculoskeletal systems. Major life activities include functions such as caring for oneself, performing manual tasks, walking, seeing, hearing speaking, breathing, learning and working. 29 C.F.R. § 1630.2(j).

■ With respect to the major life activity of working, the term "substantially limits" means that the person is significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes, as compared to the

average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491–92, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Muller v. Costello*, 187 F.3d 298, 313 (2d Cir.1999). Similarly, an impairment that "disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one." *Parisi v. Coca–Cola Bottling Co. of New York*, 995 F.Supp. 298, 301 (E.D.N.Y.1998), aff'd, 172 F.3d 38 (2d Cir.1999), quoting, *Heilweil v. Mt. Sinai Hospital*, 32 F.3d 718, 722 (2d Cir.1994).

■ When considering whether a person is substantially limited in the ability to work it is appropriate to consider:

(A) the geographical area to which the individual had reasonable access;

(B) the job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) the job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

*Muller v. Costello*, 187 F.3d 298, 313 (2d Cir.1999), quoting, 29 C.F.R. § 1630.2(j)(3)(ii).

## 2. *Regarded as Disabled*

■ As noted above, the ADA includes within the definition of disability being "regarded as" disabled. 42 U.S.C. § 12102(2)(A)-(C). The definition of disability described above is as relevant to this type of claim as it is to a claim of actually having a disability. *Ryan v. Grae & Rybicki, P.C.* 135 F.3d 867, 872 (2d Cir.1998). Accordingly, where the claim is one of being regarded, or perceived, as disabled, the plaintiff must show that the employer regards the plaintiff as disabled within the meaning of the ADA and not merely that plaintiff is regarded as having some measure of a disability or impairment. *See Ryan*, 135 F.3d at 872. Thus, to state a claim for perceived disability, a plaintiff must show that the employer perceived the plaintiff as substantially limited in a major life activity as discussed above. *E.g., Whalley v. Reliance Group Holdings, Inc.*, 2001 WL 55726 *8 (S.D.N.Y. January 22, 2001).

## II. *Disposition of the Disability Claim*

■ Plaintiff's ADA claim is premised on the notion that he has been regarded as disabled by his employer. More specifically, Plaintiff's claim is premised on the notion that his employer regards him as substantially limited in the major life activity of working. The court has reviewed the extensive record herein and it completely belies Plaintiff's position.

Far from being regarded as substantially limited in his ability to work, the evidence is overwhelming that the Sheriff's Department regarded Plaintiff as being able to perform a broad range of different tasks in his capacity as a Corrections Officer. Over the years, Plaintiff was assigned to a variety of posts, including that of floater, which could result in assignment to any number of different positions. Under these circumstances, it is clear that

Plaintiff was regarded as physically able to perform the duties of a Corrections Officer and that he was not regarded as limited in his ability to perform even this particular job.

Plaintiff cannot rely on the failure of the County to appoint him to the precise post he desired as evidence that he was perceived to be disabled within the meaning of the ADA. The failure to return Plaintiff to the 4500 control desk, appoint Plaintiff to the K–9 Unit or the SERT team, even if based upon some notion that Plaintiff was not physically fit to fulfill the duties of officers in these particular units, does not state a perceived disability claim. *See Sutton*, 527 U.S. at 491–92, 119 S.Ct. 2139; *e.g., Varre v. City of Syracuse*, 2000 WL 270966 * 5–6 (N.D.N.Y. March 6, 2000) (fact that positions available to Plaintiff "were not to his liking or did not permit the use of any of his unique talents" does not mean that employer perceived plaintiff as substantially limited in the ability to work).

Even if Plaintiff could show a perception of being unable to perform all functions necessary to the job of Corrections Officer (which he cannot) this, standing alone, would be insufficient to state a claim of disability under the ADA. The inability to perform this single job does not constitute a substantial limitation on the ability to work. *Muller v. Costello*, 187 F.3d 298, 313 (2d Cir.1999) (refusing to find plaintiff substantially limited in the ability to work even though he could no longer perform the duties of a corrections officer because he could perform other jobs utilizing similar training, knowledge, skills or abilities of a corrections officer); *see also Whalley v. Reliance Group Holdings, Inc.*, 2001 WL 55726 *8 (S.D.N.Y. January 22, 2001) (inability to perform single job of flight attendant does not constitute substantial limitation on ability to work).

In sum, Plaintiff has come forward with no evidence that Defendants regarded him as disabled within the meaning of the ADA. He therefore fails to satisfy an essential element of his *prima facie* case, *i.e.,* that he is an individual with a disability within the meaning of the statute. Defendants' motion for summary judgment dismissing Plaintiff's claim of perceived disability under the ADA is, accordingly, granted.

III. *Retaliation Claims*

A. *Elements of a Disability Retaliation Claim*

▮▮▮▮ The ADA prohibits retaliation against individuals asserting rights under the statute. 42 U.S.C. § 12203(a). To establish a prima facie case of retaliation under the ADA a plaintiff must show that: (1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action. *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir.2000), quoting, *Sarno v. Douglas–Elliman Gibbons & Ives*, 183 F.3d 155, 159 (2d Cir.1999). Where a plaintiff fails to point to admissible evidence establishing the requisite causal connection, summary judgment in favor of the defendant is appropriate. *E.g., Sarno*, 183 F.3d at 160.

▮▮▮ The court's finding that Plaintiff is not disabled within the meaning of the ADA does not necessarily preclude Plaintiff from proceeding with his retaliation claim. To go forward with such a claim, however, Plaintiff satisfies the "protected activity" prong of the *prima facie* case by demonstrating a "good faith, reasonable belief" that his employer violated the law.

*Weissman,* 214 F.3d at 234; *Muller,* 187 F.3d at 311.

### B. *Disposition of the Retaliation Claims*

At the outset, Defendants argue that under the factual circumstances here Plaintiff could not have possibly possessed the good faith belief that Defendants perceived him as disabled within the meaning of the ADA. Additionally, Defendants argue that Plaintiff's retaliation claim must be dismissed because: (1) he did not suffer adverse employment action; (2) he cannot establish the required causal connection between any protected activity and adverse employment action and (3) even if Plaintiff suffered adverse employment action in a time period necessary to infer any causal connection, Defendants have established legitimate, non-discriminatory reasons for their actions.

### 1. *Good Faith Belief*

The nature of Plaintiff's belief is not a determination that is easily made in the context of a motion for summary judgment. For purposes of this motion, the court assumes that Plaintiff possessed the requisite good faith belief and was therefore engaged in activity protected by the ADA. Upon making this assumption the court turns to consider the remaining grounds to dismiss the retaliation claim.

### 2. *Adverse Employment Action*

The court holds that Plaintiff has created the necessary issue of fact with regard to the issue of adverse employment action. While it is clear that a mere undesired lateral move, standing alone, would not be sufficient to constitute adverse employment action, Plaintiff here alleges that

he has lost significant opportunities for overtime pay. This allegation, in addition to others set forth by Plaintiff, are sufficient to overcome summary judgment on the issue of adverse employment action.[2]

### 3. *Causal Connection*

Despite the findings that Plaintiff has established the requisite issues of fact regarding his good faith belief that he was engaged in protected activity and the issue of adverse employment action, the court holds that the retaliation claim must be dismissed for failure to raise an issue regarding the necessary causal connection between engaging in protected activity and the adverse action.

As noted above, Plaintiff's first claim of retaliation alleges adverse action with respect to overtime assignments in March and April of 1999. These actions are alleged to have been taken in retaliation for the 1997 charge with the EEOC and the 1999 complaint to the bias unit. As to the 1997 charge with the EEOC, the 1999 overtime action is far too remote in time to establish any inference regarding a causal connection. Although the 1999 complaint to the bias unit is closer in time to the 1999 incidents, the facts belie any causal connection. Plaintiff admits that he was satisfied with his employer's response to his bias complaint. He can point to no fact linking any decision regarding overtime to the complaint involving the photograph of the dog. Instead, the record is clear that the County took the complaint seriously and investigated and resolved the matter appropriately. There is no rational reason to believe that any retaliatory action would thereafter follow.

Nor is there any reason to draw any causal inference between Plaintiff's

---

**2.** All activities complained of by Plaintiff do not necessarily amount to adverse employment action. For example, the random incident involving the writing of Plaintiff's name on a dog collar cannot be construed as adverse employment action.

September 1999 negative performance evaluation, the December 1999 disciplinary memo or Greco's January 2000 assignment as a floater and the filing of this lawsuit. The County was on notice of Plaintiff's claims of discrimination since the filing of the EEOC charge in 1997. As the County was undoubtedly aware, the filing of a lawsuit would likely follow such charges. It makes little sense to believe that retaliatory action would be taken two years later, after a lawsuit was filed.[3]

 Finally, the court rejects Greco's claim that his latest rejection for appointment to the K–9 Unit and the September 2000 observation of Plaintiff training a dog were measures taken in retaliation for his giving testimony before the Nassau County Legislature as well as for the filing of this lawsuit. Greco began applying for appointment to the K–9 Unit and receiving rejection notices in 1992—several years before he made the initial claim of discrimination to the EEOC. It matters not that Plaintiff is of the opinion that he was passed over for the K–9 assignment in favor of a less qualified applicant. The issue is not whether Defendants made the right choice for the position; the issue is whether there is any evidence of discrimination in the decision to pass over Plaintiff. There is none. There are similarly no facts to connect the September 2000 chance observation of Plaintiff with the initiation of this lawsuit.

#### 4. *Legitimate Reasons for Defendants' Actions*

 Even if credulity is so strained as to believe that the actions referred to above were taken in retaliation for the exercise of statutory rights, Defendants have come forward with ample evidence of a non-discriminatory reason for their actions. The record regarding Plaintiff's abysmal attendance record stands as more than enough evidence of a legitimate non-discriminatory reason for actions taken regarding Greco's evaluation and work assignments. Plaintiff does not dispute that he has taken each and every sick, personal and vacation day afforded by the County. Surely, it was not unreasonable (and certainly not discriminatory) for the County to assign Plaintiff to positions where a consistent attendance record may not have been crucial. Moreover, the County cannot be faulted for disciplining Greco and assigning him to arguably less favorable posts based upon his attendance record.

 With respect to the September 2000 incident when Plaintiff was observed training a dog in a park, it is undisputed that Golio was off duty and observed Greco by chance. Even if Greco was observed pursuant to some surveillance operation, the County would certainly have been within its rights to surveil an employee suspected of abusing its sick leave policy. This is especially true with respect to an employee with an attendance record like that of the Plaintiff.

#### 5. *The Retaliation Claim Must Be Dismissed*

To summarize, despite the presence of questions of fact regarding Greco's good

---

**3.** The court notes that Plaintiff does not claim that his assignment to the 832 delivery gate upon his return from his 1996 disability leave was retaliatory in nature. He claims only that such assignment violated the ADA because it was a decision made on the assumption that plaintiff was disabled. This claim has been rejected by the court. In any event, the delivery gate assignment cannot be deemed retaliatory. Such a light duty post was routinely and appropriately assigned to officers returning from disability leave. Indeed, even Plaintiff did not complain about this assignment until he held the post for over a year.

faith in the filing of charges and whether he was subject to adverse employment action, Defendants are nonetheless entitled to summary judgment on the retaliation claim. Many employment decisions concerning Plaintiff's placement were made prior to Plaintiff's taking any protected action. There are no facts establishing a causal relationship between any other actions and the filing of the 1997 EEOC complaint or the filing of this lawsuit. Finally, there is ample evidence of legitimate non-discriminatory reasons for all employment action taken with respect to the Plaintiff. Nothing in Plaintiff's voluminous papers (including the allegations of the complaint) tends to rebut those reasons.

For the foregoing reasons, the court grants the Defendants' motion for summary judgment as to Plaintiff's claims of retaliation.

## IV. *Rehabilitation Act*

■ Plaintiff's Rehabilitation Act claims are governed by the same standards as his ADA claims. *See Stone v. City of Mount Vernon,* 118 F.3d 92, 96 (2d Cir.1997); *Sacay,* 44 F.Supp.2d at 502. Accordingly, these claims fail and must be dismissed for the same reasons set forth above with respect to the ADA claims.

## V. *The Section 1983 Claims*

### A. *First Amendment Civil Rights Claim*

#### 1. *Legal Principles*

■ Public employees retain their constitutionally protected right to comment on matters of public interest. *Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Bd. of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). To state a claim alleging retaliation for exer-

cise of this right, Plaintiff must show: (1) that his speech was constitutionally protected; (2) that he suffered an adverse employment decision, and, (3) that a causal connection exists between the exercise of speech and the adverse employment action, sufficient to establish that the speech was a motivating factor in the decision to take the adverse action. *McCullough v. Wyandanch Union Free School District,* 187 F.3d 272, 278 (2d Cir.1999); *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999); *see also Hellstrom v. United States Dep't of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir.2000).

Once the plaintiff demonstrates these elements, defendant has the opportunity to show that the same employment decisions would have been made in the absence of the exercise of speech. *Morris,* 196 F.3d at 110.

#### 2. *Disposition of the First Amendment Claim* ·

■ The factual basis for Plaintiff's First Amendment claim is that after receiving the January 2000 subpoena to testify before the Nassau County Legislature (in connection with an investigation regarding overtime inquiries as the Nassau County Correctional Facility) Plaintiff was asked by two fellow employees why he was asked to testify. Retaliation allegedly followed.

Plaintiff's First Amendment claim is, to say the least, exceedingly vague. First, there is no indication as to the nature of Plaintiff's testimony and the position of those making inquiry. At most, Plaintiff alleges that he spoke on a matter of public concern, individuals asked him why he was subpoenaed and employment action was thereafter taken.

There is absolutely no evidence upon which to link any testimony with any em-

ployment action. Thus, there is no evidence upon which to establish (or infer in any way) that the speech (whatever it was) was a motivating factor in the decision to take any employment action (whether adverse or not). In short, Plaintiff's First Amendment claim is so insubstantial as to require dismissal. Defendants' motion for summary judgment on this claim is, accordingly, granted.

## B. *Equal Protection Claim*

### 1. *Legal Principles*

 The Fourteenth Amendment right to equal protection of the law is "essentially a direction that all persons similarly situated be treated alike." *City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Disabled American Veterans v. United States Dep't of Veterans Affairs,* 962 F.2d 136, 141 (2d Cir. 1992). To establish an Equal Protection violation, plaintiff must show purposeful discrimination directed to an identifiable class. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995).

Even if no suspect class or identifiable right is implicated, an Equal Protection violation may be found based upon "arbitrary and irrational discrimination" or an allegation of selective treatment in terms of public employment where it is shown that such treatment was motivated by an intention to discriminate based upon impermissible considerations, such as race or by a malicious or bad faith intent to injure the person. *See Muller,* 187 F.3d at 309; *Overhoff v. Ginsburg Development, L.L.C.,* 2001 WL 533219 *7 (S.D.N.Y. May 16, 2001); *Quinn v. Nassau County Police Department,* 53 F.Supp.2d 347, 355 (E.D.N.Y.1999).

### 2. *Disposition of Equal Protection Claim*

Plaintiff here is a white male. He is not, and does not argue to be, a member of any suspect or identifiable class. Instead, he argues that his equal protection rights were violated by malicious, arbitrary and irrational treatment. It is clear, however, that Plaintiff was neither subject to arbitrary and irrational discrimination nor was he the victim of a malicious or bad faith intent to injure.

The only incident that might possibly indicate malice is the incident involving the picture of Plaintiff's name on a dog collar. This was an isolated incident, however, that was handled promptly and properly when brought to the attention of the appropriate officials. The court has already held that there is no basis for linking this incident to any employment decision made concerning Plaintiff. The motion for summary judgment on the equal protection claim is granted.[4]

## VI. *Pendent State Claims*

Having granted Defendants' motion for summary judgment on all federal claims alleged, the court declines to exercise jurisdiction over Plaintiff's state claims and dismisses those claims without prejudice.

### *CONCLUSION*

For the foregoing reasons, the defense motion for summary judgment is granted in its entirety. The Clerk of the Court is directed to close this case.

SO ORDERED

---

4. In light of the dismissal of the Section 1983 claims, it is unnecessary to reach the issues of municipal and personal liability.