Stephen A. DELLAVOLPE, Plaintiff,

v.

The CITY OF NEW YORK; New York City Police Pension Fund (N.Y.CPPF); Raymond W. Kelly, Police Commissioner; Neldra M. Zeigler, Deputy Commissioner Office of Equal Employment Opportunity; Rafael Pinero, Chief of the Personnel Bureau; Dr. Eli Joseph Kleinman, Supervising Chief Surgeon, Medical Division; Dr. Nicholas Tsirilakis, Department Surgeon, Medical Division; Smith, Commanding Officer Bronx Healthcare Facility; Michael D. Welsome, Executive Director, New York City Police Pension Fund; Nicholas Frank Depalma, M.D., Chairman, Article II Medical Board, New York City Police Pension Fund; Theodore Cohen, M.D., Board Doctor, Article II Medical Board, New York City Police Pension Fund; Joseph Bottner, M.D., Board Doctor, Article II Medical Board, New York City Police Pension Fund, each individually and in their official capacities as employees of the CITY or the NYCPPF, Defendants.

Case No. 05–CV–5118 (FB)(JMA).

United States District Court,
E.D. New York.

Dec. 14, 2009.

Eric Sanders, Esq., Susan P. Bernstein, Esq., Jeffrey L. Goldberg, P.C., Lake Success, NY, for the Plaintiff.

Michael A. Cardozo, Esq., Corporation Counsel of the City of New York by Joshua Robert Fay, Esq., New York City Law Department, New York, NY, Blanche Greenfield, Esq., on the Brief, for the Defendants.

## MEMORANDUM AND ORDER

BLOCK, Senior District Judge:

Plaintiff Stephen A. Dellavolpe ("Dellavolpe") is a former police officer with the New York City Police Department ("NYPD"). He had a seizure while on duty in 2003. NYPD medical personnel concluded that he was at risk for a recurrence of seizures, and that he was therefore not capable of performing all the essential functions of a police officer. He was involuntarily retired in 2006. Dellavolpe alleges that his termination was in violation of the Americans with Disabilities Act of 1990 ("the ADA"), the New York State Human Rights Law ("the NYSHRL"), and the New York City Human Rights Law ("the NYCHRL"). Defendants (collectively and alternatively, "the City" or "the NYPD") now move for summary judgment. The City's motion is granted, in that Dellavolpe's federal dis-

crimination claim under the ADA is dismissed with prejudice and his NYSHRL and NYCHRL claims for disability discrimination are dismissed without prejudice to renewal in state court.[1]

## STATEMENT OF THE CASE

Except where specifically noted, the following facts are undisputed; they are drawn chiefly from the transcript of Dellavolpe's deposition.

Dellavolpe was appointed as an NYPD Police Officer in 2001. On July 30, 2003, he was guarding a prisoner at St. Barnabas Hospital in the Bronx when he suffered a seizure. Dellavolpe was examined at St. Barnabas and later transferred to Cornell Presbyterian Hospital, where he suffered a second seizure later that same day.[2] He was diagnosed with a lesion on his brain, issued a prescription for the anti-seizure medication Dilantin, and released.

Dellavolpe was placed on sick leave for approximately two months. Before returning to service with the NYPD, he met with defendant Dr. Nicholas Tsirilakis, the NYPD Neurologist. Dr. Tsirilakis drafted a report that concluded that Dellavolpe should be placed on "restricted duty for about one year and then re-evaluate[d]." Fay Decl., Ex. F (Report of N. Tsirilakis (Sept. 8, 2003)). Dellavolpe testified at his deposition that Dr. Tsirilakis told him he could return to full duty if he did not suffer another seizure during the year.

*See* Dellavolpe Dep. Tr. at 30 (Jan. 15, 2008).

Dellavolpe was placed on limited-duty status, and was no longer permitted to carry his NYPD service weapon. His status was later changed to restricted duty. He returned to service, handling the 46th Precinct's non-emergency information hotline. He was later transferred to the NYPD's Bronx Courts division, where he performed administrative duties and guarded and escorted prisoners. He served at this assignment until his involuntary retirement in 2006. *See* Dellavolpe Aff. ¶¶ 56–57, 65.

In June 2004, Dellavolpe met with Dr. Tsirilakis a second time. He had remained on Dilantin and told Dr. Tsirilakis that he had experienced no further seizure-related problems; nonetheless, Dr. Tsirilakis reported that Dellavolpe should remain on "restricted duty without firearms" and suggested that Dellavolpe should be "survey[ed] for retirement." Fay Decl., Ex. I (Report of N. Tsirilakis (June 7, 2004)).

Drs. Yves LeBrun and Lawrence Hirsch, Dellavolpe's private physicians, thereafter wrote letters that opined that Dellavolpe could return to full duty. Dellavolpe submitted the letters to the NYPD. *See* Fay Decl., Ex. J (Letter from Y. LeBrun (June 16, 2004)) ("I have no [problem] with [Dellavolpe] returning to full duties of his job."); Fay Decl., Ex. L (Letter from L. Hirsch to Y. LeBrun, "RE:

1. Dellavolpe initially brought claims for: (1) disability discrimination, retaliation, and hostile work environment, all in violation of the ADA, 42 U.S.C. § 1983, the NYSHRL, and the NYCHRL; and (2) conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985. In response to the City's motion, Dellavolpe has withdrawn his federal, state, and municipal law claims for retaliation and hostile work environment, as well as all claims that sound under 42 U.S.C. §§ 1983

and 1985. *See* Pl.'s Opp. to Def.'s Mot. for Summ. J. at 19. Therefore, Dellavolpe's only remaining claims are for disability discrimination in violation of the ADA, NYSHRL, and NYCHRL.

2. Dellavolpe testified at his deposition that he was told that due to the close proximity of the two seizures, they were considered to be one seizure.

DELLAVOLPE, Stephen" (Sep. 28, 2004)) ("[Dellavolpe] is quite safe to continue working, driving, etc.," while on Dilantin; without Dilantin "he still probably has at least a 50 percent chance" of avoiding another seizure episode).

In December 2004, Dellavolpe met a third and final time with Dr. Tsirilakis. Dellavolpe had remained on Dilantin, and was asymptomatic for seizures. Dr. Tsirilakis concluded, however, that "because of the permanency of the Epileptogenic focus (angioma) [Dellavolpe] must remain on chronic anti-epileptic treatment."[3] Fay Decl., Ex. M (Report of N. Tsirilakis (Dec. 22, 2004)). He also concluded that Dellavolpe's "[history of] recent seizures is not compatible with NYPD officer duties," and suggested that Dellavolpe be "survey[ed] for retirement on medical disability[.]"[4] Id.

The NYPD's Article II Medical Board ("the Board") makes recommendations on whether NYPD officers should be retired on medical disability. In January 2005, Dr. Eli Kleinman, the Supervising Chief Surgeon of the NYPD's Medical Division, recommended that the Article II Board examine Dellavolpe for retirement. Dr. Kleinman stated that Dellavolpe "suffer[ed] from partial complex seizures"; was "currently on Dilantin therapy"; and "must remain on [Dilantin] treatment." Fay Decl., Ex. N (Recommendation of Dr. Kleinman (Jan. 11, 2005)). Dr. Kleinman concluded that Dellavolpe's "history of recent seizures is not compatible with the duties of a police officer" because he could suffer an "alteration of consciousness" while performing the "essential functions of a police officer, which includes [sic] the carrying of firearms and the operation of emergency vehicles." Id. Dr. Kleinman concluded that, because of the risk that Dellavolpe would suffer an "alteration of consciousness" while on duty, "Dellavolpe poses a potential hazard to himself and the public[.]" Id.

Dellavolpe went before the Article II Board on February 2, 2005. The Board reviewed some of Dellavolpe's medical records, Dr. Tsirilakis's three reports, Dr. LeBrun's letter of June 2004, and Dr. Hirsch's letter of September 2004, but not Dr. Kleinman's January 2005 report. The Board was of the unanimous opinion that Dellavolpe should be retired from service; the report summarily concludes:

Based upon the documentation presented to the Medical Board, as well as [meeting with Dellavolpe on February 2, 2005], it is the unanimous opinion of this Article II Medical Board to recommend approval of the Police Commissioner's application for Ordinary Disability Retirement. The diagnosis is Seizure Disorder–Complex Partial, Secondary to a Right Cerebral Angioma.

Fay Decl., Ex. P at 3–4 (Article II Board Examination (Feb. 2, 2005)).

Dellavolpe sought to overturn the Board's determination. He submitted another letter from Dr. LeBrun, dated June 11, 2005; Dr. LeBrun reiterated his opinion that Dellavolpe could be returned to full duty without limitations. The Board also received Dr. Kleinman's January 2005

---

3. Epileptogenic means "causing epilepsy." *Stedmans Medical Dictionary* 134910 (2000). An angioma is "a swelling or tumor due to proliferation, with or without dilation, of the blood vessels (hemangioma) or lymphatics (lymphangioma)." *Id.* at 22480.

4. Dr. Tsirilakis's reference to a "history of seizures" (plural) and not "seizure" (singular) is in contrast to Dellavolpe's deposition testimony. As noted, Dellavolpe testified that the physicians who treated him at the time of his 2003 seizure incident told him that, due to the proximity of the two seizure events, they were considered one seizure. *See* n. 2, *supra.*

report, which it had not previously reviewed. After a second hearing, the Board adhered to its prior decision. *See* Fay Decl., Ex. T (Article II Board Report (June 29, 2005)). This report expressly noted Dr. Kleinman's conclusion that Dellavolpe could not perform the "myriad essential functions of a police officer" including the "carrying of a [*sic*] firearms and the operation of emergency vehicles," and concluded:

> Based upon [Dr. LeBrun's letter and Dr. Kleinman's report], it is the opinion of this Article II Medical Board to reaffirm the previous decision and recommend approval of the Police Commissioner's application for Ordinary Disability Retirement. The diagnosis is Seizure Disorder–Complex Partial, Secondary to a Right Cerebral Angioma.

*Id.* at 2.

On or about December 14, 2005, Dellavolpe appeared before the Board a third time; the Board re-affirmed its prior conclusions. *See* Dellavolpe Dep. Tr. at 41–43.[5] Dellavolpe was thereafter involuntarily retired from the NYPD on October 18, 2006. *See id.* at 43–44.

Since the incident of July 30, 2003, Dellavolpe has not suffered any further seizures. He remains on Dilantin. Subsequent to his retirement, he completed a college degree, and was employed, part-time, as head of security at an Albany-area nightclub. In Dellavolpe's view, his condition "doesn't affect [his] life at all." Dellavolpe Dep. Tr. at 47.

## DISCUSSION

### A. Standard of Review

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether summary judgment is appropriate, the Court should resolve all ambiguities and draw all permissible factual inferences against the movant. *See id.* at 255, 106 S.Ct. 2505. Summary judgment is warranted when the nonmovant has no evidentiary support for an essential element on which it bears the burden of proof. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

### B. Dellavolpe's ADA Claim

Dellavolpe bears an initial burden of establishing a *prima facie* case of disability discrimination. *See Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 383 (2d Cir.1996). To meet his burden Dellavolpe must show that: (1) the City is subject to the ADA; (2) he suffered from a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without reasonable accommodation; and (4) he suffered an adverse employment decision because of his disability. *See Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869–70 (2d Cir.1998).

---

**5.** Documentation of Dellavolpe's third appearance before the Board does not appear in the record. Dellavolpe testified that he received a copy of the minutes from the meeting. *See* Dellavolpe Dep. Tr. at 43. The parties do not dispute that the sum and substance of this meeting recommended "the same thing," namely, "for [Dellavolpe] to retire." *Id.*

■ The City contends that Dellavolpe has not established that he suffered from a disability within the meaning of the ADA. *See* Def. Mem. at 6–9. The ADA defines as "disabled" any person who: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. *See* 42 U.S.C. § 12102(1). The Equal Employment Opportunity Commission ("the EEOC") has issued regulations that define the terms "major life activity" and "substantial limitation"; these interpretations are entitled to "great deference." *Francis v. City of Meriden,* 129 F.3d 281, 283 n. 1 (2d Cir. 1997). Major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). A substantial limitation is one that renders a person "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity" as compared to an average person's ability to perform the same activity. 29 C.F.R. § 1630.2(j)(1)(ii).

Dellavolpe does not contend that he is actually disabled; there has been "no change in [his] life-style" since the seizure in July 2003, and his brain lesion "doesn't affect [his] life at all." Dellavolpe Dep. Tr. at 47. Dellavolpe must therefore establish that the NYPD "regarded him as having an impairment that substantially limited a major life activity." *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 646 (2d Cir.1998). The Supreme Court has explained that persons can be "regarded as" disabled in one of two ways: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), *superseded by statute on other grounds,* ADA Amendments Act of 2008, Pub.L. 110–325, 122 Stat. 3553 (2008).[6]

Dellavolpe claims that the City regarded him as being substantially limited in the major life activity of working. The EEOC has issued regulations that define what a claimant must show to succeed on such a claim. To make out a *prima facie* case under the EEOC's interpretation of the ADA, Dellavolpe must offer evidence that the NYPD perceived him as being "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes[.] The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3). Factors which may be considered in deciding whether an individual's limitations were perceived as significantly restricting the ability to work in a "class of jobs" are "[t]he job from which the individual has been [perceived as] disqualified . . . and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also [perceived as] disqualified[.]" 29 C.F.R. § 1630.2(j)(3)(ii)(B). The EEOC's definition of the phrase "broad range of jobs in various classes" focuses on "[t]he job from

---

**6.** The ADA Amendments Act did not take effect until January 1, 2009, and was not intended to apply retroactively. *See* ADA Amendments Act of 2008 at § 8 (setting effective date of January 1, 2009); *accord Ragusa v. Malverne Union Free Sch. Dist.,* 582 F.Supp.2d 326, 342 (E.D.N.Y.2008). In any event, the parties do not contend that the amendments made to the ADA by the 2008 Act are germane.

which the individual has been [perceived as] disqualified ... and the number and types of other jobs *not* utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also [perceived as] disqualified[.]" 29 C.F.R. § 1630.2(j)(3)(ii)(C) (emphasis added).

Dellavolpe argues that the City regarded him as substantially limited in working because it believed that he might have another seizure and because he took anti-seizure medication. The City readily concedes that it believed Dellavolpe has "several risk factors for a recurrence of seizure activity." Kleinman Aff. at ¶ 8.[7] The City also readily concedes that it believed that Dellavolpe's medication, combined with "dietary and other factors," could affect his "level of consciousness, balance and coordination, cognitive abilities and may cause other neurological problems." *Id.* at ¶ 9. Dellavolpe argues that this combination of perceived risks "would substantially limit an affected individual's ability to perform any type of employment," and that, therefore, the City regarded him as being disabled. Pl.'s Mem. at 9.

Clearly, someone with limited control of their own consciousness, balance, coordination, and cognitive abilities would face serious limitations in working. Unfortunately for Dellavolpe, Dr. Kleinman's affidavit was not submitted until the City moved for summary judgment. With respect to the City's perceptions of Dellavolpe's limitations in working, it matters not what Dr. Kleinman said in September 2008; what does matter is what Dr. Kleinman, and the Article II Board, said in reaching their decision to retire Dellavolpe in 2005 and

2006. The Board reached its February 2005 decision to retire Dellavolpe without reference to Dr. Kleinman's January 2005 report; the Board merely relied upon Dr. Tsirilakis's opinion that an NYPD police officer with a risk of seizures would not be able to perform his full duties. When the Board reviewed its decision at Dellavolpe's request, it took into account Dr. Kleinman's report of January 2005, which specified that Dellavolpe would not be able to perform full patrol duties, because those duties require carrying firearms and operating emergency vehicles.[8] The Board's third and final report adhered to these decisions. There is therefore no factual dispute about what Dellavolpe's perceived limitations were at the time of his termination: an inability to perform full patrol duties, because he was unable to carry a firearm or drive an emergency vehicle.

Accordingly, the Court must examine whether the NYPD's perception of Dellavolpe's limitations would constitute substantial limitations in the major life activity of "working." Dellavolpe contends that, at the very least, someone incapable of carrying a firearm would be precluded from any employment in law enforcement or security, either of which could constitute a "class of jobs." The record contains no evidence, however, that these "class[es] of jobs" universally require this qualification. Consequently, while the NYPD clearly concluded that Dellavolpe's perceived limitations disqualified him from the single job of NYPD police officer, those perceived limitations do not transmute, without more, to a perception by the City that Dellavolpe could not perform either a "class of jobs" or a "broad range of jobs in various classes."

---

7. Dr. Kleinman submitted this affidavit in support of the City's motion for summary judgment; it is dated September 15, 2008, nearly two years after Dellavolpe's NYPD employment was terminated.

8. Dr. Kleinman's January 2005 report notably did not make reference to the various risk factors outlined in his September 2008 affidavit.

■ It was, therefore, incumbent upon Dellavolpe to offer evidence from which a factfinder could conclude that his perceived disability would bar him from any other employment (which would here be highly improbable), or that, given that perception, there were an insufficient "number and types of jobs utilizing similar training, knowledge, skills or abilities" within his geographical area. These are heavy burdens, which realistically make "perceived as disabled in working" cases extremely difficult to prove. As aptly noted by the Sixth Circuit:

> Proving that an employee is regarded as disabled in the major life activity of working takes a plaintiff to the farthest reaches of the ADA. It is a question embedded almost entirely in the employer's subjective state of mind. Thus, proving the case becomes extraordinarily difficult. Not only must a plaintiff demonstrate that an employer thought he was disabled, he must also show that the employer thought that his disability would prevent him from performing a broad class of jobs. As it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform, and certainly do not often create direct evidence of such considerations, the plaintiff's task becomes even more difficult.

*Ross v. Campbell Soup Co.,* 237 F.3d 701, 709 (6th Cir.2001).

The difficulty in bringing a viable "perceived as disabled in working" case is reflected by the Second Circuit's decision in *Giordano v. City of New York,* 274 F.3d 740 (2d Cir.2001), a case markedly similar to Dellavolpe's.

Giordano was an NYPD officer who was diagnosed with an aortic aneurysm. To treat that condition, he was prescribed a life-long regimen of the anti-coagulant medication Coumadin. *See id.* at 743–44. The NYPD Supervising Chief Surgeon opined that Coumadin rendered Giordano susceptible to "catastrophic bleeding from even minor injuries," and the NYPD Article II Board concluded that, as a result, Giordano was not capable of performing full duty or patrol as an NYPD officer. *See id.* at 744–45. Giordano was therefore retired from service, albeit involuntarily. The circuit court explained:

> The decisive issue, then, is whether Giordano introduced evidence to support the allegation that the defendants regarded him as disqualified not only from full-duty patrol as an NYPD police officer but from "working." ... Personnel Chief Markman testified that the NYPD has "no full duty/nonpatrol positions" to which it could assign Giordano. The NYPD therefore argues that it could not, in effect, place Giordano on the equivalent of "light duty." This does not mean, however, that the defendants regarded Giordano as disabled from a "broad class of jobs" [9] compared to "the average person having comparable training, skills, and abilities." Giordano introduced evidence that establishes at most that the defendants regarded him as disabled from police or other investigative or security jobs that involve a substantial risk of physical confrontation. The record contains no evidence from which we can infer that the defendants thought, or had grounds for thinking, that other jobs in the public or private sector—such as, for example, a job as a security guard or a private

9. While *Giordano* uses the term "broad class of jobs" in lieu of the EEOC's dichotomy between a "class of jobs" and a "broad range of jobs in various classes," the Court interprets *Giordano*'s use of the term "broad class of jobs" as a truncated reference to both of the EEOC's formulations.

investigator, or with a police department that does not require every officer to be capable of patrol duty—carry the same nature or degree of risk ... We thus find no evidence in the record that suggests that the defendants perceived Giordano as unable to work in a "broad class of jobs."

*Giordano*, 274 F.3d at 749–50 (internal citations and marks omitted). The Court of Appeals therefore affirmed summary judgment for the NYPD on Giordano's ADA claim since he had failed to present evidence that the NYPD "regarded" him as disabled from *any job other than that of* an NYPD officer. *See id.*

The only factual differences between Dellavolpe and Giordano are their medications and the effects thereof. What they share in common, however, is a decision by the NYPD that neither could perform the full-duty job of a NYPD police officer, and a lack of evidence "that other jobs in the public or private sector—such as ... a job as a security guard or a private investigator, or with a police department that does not require every officer to be capable of patrol duty—carry the same nature or degree of risk." 274 F.3d at 749–50.[10] If anything, Giordano's perceived limitations presented a more persuasive case. For example, the job of head of security at a nightclub—a job within the security "class of jobs" and a job Dellavolpe has held since his retirement from the NYPD—

would not necessarily require an employee to carry a firearm. One in charge of nightclub security would, however, be required to face the possibility of physical confrontations, with attendant risks, however remote, of injury causing bleeding; thus, the limitations the NYPD perceived in Giordano's case would affect a wider swath of jobs than the limitations the NYPD perceived in Dellavolpe's case. In any event, as in *Giordano*, there is no evidence in the record defining the requirements for any job other than that of NYPD police officer.

In sum, Giordano arguably presented a stronger case for an ADA remedy than does Dellavolpe. Since there is no principled distinction between Giordano and Dellavolpe, the Court is constrained to grant the City's motion.

It is irrelevant, therefore, that Dellavolpe believes that his diagnosis is "a matter of fact in dispute," Pl.'s Mem. at 4, and that the NYPD's conclusion that he has an elevated risk of seizures may be in error. Even if Dellavolpe could prove that the NYPD's conclusion was in error to an absolute certainty, he was still required to offer evidence that, having reached that erroneous conclusion, the City also regarded him as disqualified from a class of jobs or a broad range of jobs in various classes. This he has failed to do.

---

10. Dellavolpe could have, for example, retained the services of a vocational expert; such an expert could have issued a report on the difficulties Dellavolpe would experience in obtaining employment as a police officer, security guard, or private investigator given the limitations perceived by the NYPD (carrying firearms and driving emergency vehicles). Such evidence might provide a basis to conclude that an issue of fact exists with respect to whether the NYPD perceived Dellavolpe as disqualified from the requisite "class of jobs." The use of vocational experts is common, and sometimes required, in Social Security Administration proceedings. *See, e.g., Pratts v. Chater*, 94 F.3d 34, 38–39 (2d Cir.1996); Soc. Sec. Admin. Ruling No. 00–4P, 2000 WL 1898704 (Dec. 4, 2000) (setting out Social Security Administration's guidelines for use of vocational expert testimony). The record suggests, however, that this might prove fruitless in light of the fact that subsequent to his discharge from the NYPD he obtained employment as head of security at a nightclub, assuming his employer knew of the reason why he was no longer a NYPD police officer.

**120**

The City also contends that Dellavolpe's ADA claim fails because his seizure history rendered him incapable of performing the essential functions of an NYPD police officer. Since Dellavolpe cannot meet his *prima facie* burden of showing that he was disabled within the meaning of the ADA, the Court need not reach that issue. *See Giordano*, 274 F.3d at 743 (declining to reach the "essential function" issue because Giordano failed to meet burden as to whether he was "regarded as" disabled); *id.* at 746 (noting that district court concluded that Giordano was not "regarded as" disabled; "this conclusion alone disposed of Giordano's ADA claim").

Nonetheless, the Court is not blind to a poignant and undisputed fact: Dellavolpe obviously could perform the vast majority of the "essential functions" of NYPD officers. He did all that the NYPD asked of him for more than five years, and for more than three years after his seizure incident, albeit in a restricted duty capacity.

The rationale of the City's decision to retire Dellavolpe is clouded further by his contention that the NYPD has treated other officers—some with more serious impairments—differently.[11] Indeed, he has submitted a copy of an NYPD publication that trumpets the achievements of impaired officers. This calls into question the City's definition of the "essential functions" of an NYPD police officer and the consistency with which that definition is applied.[12] The City's apparent inconsistency on these points is troubling to the Court.

All this is to no avail, because Dellavolpe cannot meet his burden with respect to the issue of whether he was regarded as disabled. He has just cause to feel wronged, but the ADA does not provide him a remedy.

## C. Dellavolpe's NYSHRL and NYCHRL Claims

■ Dellavolpe's failure to demonstrate a disability within the meaning of the ADA does not mean that he could not demonstrate a disability under the NYSHRL and NYCHRL. The standards for disability under those laws are broader than under the ADA. *See Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 154–55 (2d Cir.1998) (holding that any "medically diagnosable impairment" qualifies as a disability under the NYSHRL); *Sacay v. Research Found. of The City of New York*, 44 F.Supp.2d 496, 503 (E.D.N.Y.1999) (holding that NYCHRL standard for disability is at least as broad as that under the NYSHRL). The disposition of Dellavolpe's only federal claim, however, requires the Court to determine whether it should exercise supplemental jurisdiction over his NYSHRL and NYCHRL claims.

■ 28 U.S.C. § 1367 defines a federal court's authority to exercise supplemental jurisdiction over non-federal claims: "The district court may decline to exercise supplemental jurisdiction over a claim ... [if] the district court has dismissed all claims

---

**11.** Dellavolpe points in particular to the NYPD's Roosevelt Award, given to NYPD officers who provide "exceptional service to the Department while overcoming a severe illness or injury." One Roosevelt Award recipient suffered: (1) a gunshot wound to the head, rendering him blind in one eye; and (2) a seizure that caused him to break four vertebrae in a fall. *See* 68 *Spring 3100* at 15 (Sept./Oct. 2005), Bernstein Decl. Ex. 4. This

officer remained employed with the NYPD thirteen years after these injuries.

**12.** Officer Giordano raised exactly these concerns. *See Giordano*, 274 F.3d at 749 ("[The NYPD Personnel Chief] testified that the NYPD has 'no full duty/non-patrol positions to which it could assign Giordano'"; "we note that Giordano introduced evidence that tends to call this proposition into doubt.").

over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the absence of any remaining federal claims, the appropriate analytic framework to be applied to discrimination claims based on a 'disability' as defined by New York state and municipal law is a question best left to the courts of the State of New York." *Giordano*, 274 F.3d at 754 (reversing summary judgment on NYSHRL and NYCHRL claims; remanding with instructions to dismiss claims without prejudice). Accordingly, the Court declines to exercise supplemental jurisdiction over Dellavolpe's NYSHRL and NYCHRL claims.

### CONCLUSION

The City's motion for summary judgment on Dellavolpe's ADA claim is granted. Dellavolpe's claims for retaliation, hostile work environment, as well as his claims that sound under 42 U.S.C. Sections 1983 and 1985, having been withdrawn, are dismissed with prejudice. *See* n. 1, *supra.* Dellavolpe's claims for disability discrimination under the NYSHRL and NYCHRL are dismissed without prejudice to renewal in state court. Accordingly, the Complaint is dismissed.

**SO ORDERED.**